```
             UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF KENTUCKY
                       LEXINGTON
```

| | |
|---|---|
| ABDON IBARRA, | ) |
| | ) Civil Action No. 5:04-395-JMH |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LEXINGTON-FAYETTE URBAN COUNTY | ) **MEMORANDUM OPINION AND ORDER** |
| GOVERNMENT, *et al.*, | ) |
| | ) |
|     Defendants. | ) |

\*\*   \*\*   \*\*   \*\*   \*\*

This matter is before the Court on the Lexington-Fayette Urban County Government ("LFUCG"), Mayor Teresa Isaac, and Commissioner Alayne White's (collectively referred to as "Defendants") motion for partial summary judgment on damages [Record No. 22] and motion for summary judgment on liability [Record No. 26]. Plaintiff Abdon Ibarra has responded [Record Nos. 30 & 32], to which Defendants have replied [Record Nos. 35 & 34]. Defendants have also filed a motion for partial summary judgment on Ibarra's claims against Mayor Isaac and Commissioner White in their official capacities [Record No. 25], to which Plaintiff did not file a response, and the response time has passed. Fully briefed, and the Court being duly advised, this matter is ripe for decision.

**BACKGROUND**

Ibarra was employed by the LFUCG, as "Coordinator of Immigrant Services" from December 20, 1999, to August 27, 2003. Ibarra's duties in this position included acting as a liaison between the

1

LFUCG and the Hispanic community to ensure that people in that community were receiving adequate services. After the election of Mayor Isaac in November 2002, Ibarra expressed concerns about the local Hispanic community. Ibarra claims that all of these communications were made to public officials and/or to newspapers for public dissemination. Because he expressed these concerns, Ibarra contends, he was subjected to a pattern of retaliatory conduct by the LFUCG, Mayor Isaac, and Commissioner White, Commissioner of Social Services for the LFUCG, which culminated in his termination on August 27, 2003. Ibarra claims he was removed from projects, told to stop certain investigations, told not to speak at a meeting, reprimanded for speaking to the press without prior approval, and issued additional "severe" reprimands.

Ibarra brought suit against the LFUCG, Mayor Isaac, and Commissioner White under 42 U.S.C. § 1983 for retaliating against him for exercising his First Amendment rights and under Kentucky law for intentional infliction of emotional distress and slander. In its November 9, 2004, Memorandum Opinion and Order granting in part and denying in part Defendants' motion to dismiss, the Court held that "[t]he only act alleged in Count I of Ibarra's amended complaint that may be the subject of a timely claim of retaliation under § 1983 is the termination of Ibarra's employment on August 27, 2003." Because the Court dismissed Ibarra's claims of slander and intentional infliction of emotional distress, Ibarra's § 1983

claim for retaliation based upon his termination was the only claim to withstand Defendants' motion to dismiss.

## STANDARD OF REVIEW

Defendants have moved the Court pursuant to Federal Rule of Civil Procedure 56(c) to grant summary judgment in their favor. "Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law." *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792, 797 (6th Cir. 2005) (citing Fed. R. Civ. P. 56(c)). The moving party bears the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden is met by showing the court that there is an absence of evidence on a material fact on which the nonmoving party has the ultimate burden of proof at trial. *Id.* at 325. A fact is material if its resolution will affect the outcome of the lawsuit. *Waters v. City of Morristown*, 242 F.3d 353, 358 (6th Cir. 2001); *see Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 407 (6th Cir. 2003) ("If, under the governing law, the outcome would be the same regardless of how a factual dispute is resolved, the dispute is no bar to summary judgment."). Once the moving party satisfies its burden, the burden then shifts to the nonmoving party to "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). Entry of summary judgment is

appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

When determining the merits of a summary judgment motion, "the evidence, all facts, and any inferences that may be drawn from the facts must be viewed in the light most favorable to the nonmoving party." *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 622 (6th Cir. 2000); *see Multimedia 2000, Inc. v. Attard*, 374 F.3d 377, 380 (6th Cir. 2004). The Court must not weigh the evidence, but must decide whether there are genuine issues for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. Although the disputed issue need not be "resolved conclusively in favor of the nonmoving party," Plaintiff, as the nonmoving party in this case, "must present significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citation omitted).

## ANALYSIS

I.  **Defendants' Motion for Partial Summary Judgment on Plaintiff's Claims Against Mayor Isaac and Commissioner White in Their**

4

**Official Capacities**

In his complaint, Ibarra brought claims against Mayor Isaac and Commissioner White in their individual and official capacities. "A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity." *Matthews v. Jones*, 35 F.3d 1046, 1049 n.14 (6th Cir. 1994). "There is no longer a need to bring official-capacity actions against local government officials, . . . local government units can be sued directly for damages and injunctive or declaratory relief." *Kentucky v. Graham*, 473 U.S. 159, 167 (1985) (citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978)). The court in *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989) instructed, "a suit under section 1983 normally should be brought against either or both of two defendants:  the local public official in his individual capacity and the local government which employs or is sought to be held responsible for the acts of that local public official." *Id.* at 1244-45.  As Ibarra has named the LFUCG in his suit, his claims against Mayor Isaac and Commissioner White in their official capacities are redundant and will be dismissed.

**II. Defendants' Motion for Summary Judgment on Plaintiff's Remaining Claim Under § 1983**

A government employee has the right to speak out on matters of public concern without fear of reprisal from his or her employer.

5

*Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1185 (6th Cir. 1995). To prevail on his First Amendment retaliation claim, Ibarra, as a public employee, must establish:

> "(1) that [he] was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused [him] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [his] constitutional rights."

*Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000) (quoting *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)). When there is evidence that the adverse employment action was the result of both speech and non-speech motives, the public employee must show that his or her speech was a motivating factor in the employer's decision. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285-87 (1977). If the plaintiff establishes the above three elements, the burden of persuasion shifts to the defendants, who must show by a preponderance of the evidence "'that [they] would have taken the same action even in the absence of the protected conduct.'" *Leary*, 228 F.3d at 737 (quoting *Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999)).

The Court need not determine whether Ibarra's speech constituted constitutionally protected speech because he cannot show that his speech was a motivating factor in the defendants' decision to terminate his employment. In this case, Ibarra "must link the speech in question to the [defendants'] decision to

dismiss [him]." *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997). Ibarra must present "sufficient evidence to allow a reasonable factfinder to conclude, by a preponderance of the evidence, that [his] speech, at least in part, motivated the defendants to discharge [him]." *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1055 (6th Cir. 2001). It is undisputed that termination is an adverse action that serves to chill an ordinary person such as Ibarra from continuing to speak out about issues facing the Hispanic community. *See id.* Key to the Court's analysis is determining whether Ibarra has shown that Defendants' decision to terminate him was motivated by his protected speech. As outlined below, however, Ibarra has failed to create a genuine issue of material fact that his speech was a motivating factor in his termination.

Ibarra claims that he was terminated because he expressed concern about several issues regarding Lexington's Hispanic community. He contends that the following examples support his argument that he was terminated in retaliation for exercising his First Amendment right to free speech:

> 1. Before Mayor Isaac began her term and while Ibarra was serving under former Mayor Pam Miller, Hispanic publication *El Mundo* interviewed Ibarra. At a meeting on March 13, 2003, Ibarra was reprimanded by Commissioner White for interviewing with the publication without receiving prior approval for the interview.
>
> 2. In December of 2002, Ibarra told Bruce Edwards, Mayor Isaac's press secretary, that the Hispanic Initiative Network ("H.I.N"), a non-profit organization

partially funded by the LFUCG, had a history of racial discrimination. In January of 2003, Ibarra advised Commissioner White that Ben Figueras, president of another non-profit Hispanic organization, was requiring cash "kickbacks" from Hispanic laborers who sought assistance from the organization. Commissioner White subsequently admonished Ibarra not to tell anyone else and to stop his investigation until she contacted him.

3. In January of 2003, Ibarra told Mayor Isaac that two individuals who wanted to provide Hispanics with "unofficial identification cards" were proposing excessive fees for those cards and that he had been working on a project to provide Mexican government sanctioned identification cards at a much lower cost. Ibarra was later removed from the project. The project was assigned to Commissioner White, whom Ibarra complains did nothing to advance the project.

4. In January of 2003, Ibarra advised Council Member Paul Brooks that Hispanic workers in the Cardinal Valley area were being charged for services represented as free and overcharged for various other services. Ibarra proposed that a resolution be adopted by the LFUCG Council to help stop the overcharging. In January of 2003, Ibarra drafted a proposed resolution relating to the abuses and mistreatment of Lexington's Hispanic community. The proposed resolution was later pulled from the agenda for the LFUCG Council meeting and was never discussed again. At a March 13, 2003, meeting, Ibarra was reprimanded for discussing and drafting the resolution without first consulting or receiving approval from Commissioner White.

5. In February of 2003, Ibarra discussed with the *Lexington Herald-Leader* some of the "serious communication problems due to 'English only' public announcements to the local Hispanic community regarding life threatening and dangerous alternative heating sources" used during an ice storm. (Amended Compl. ¶ 18f.) Commissioner White subsequently reprimanded Ibarra for speaking to the newspaper without prior approval from Commissioner White or Mayor Isaac. At the March 13, 2003, meeting, Ibarra was again reprimanded for speaking to the newspaper without prior approval.

6. Ibarra's duties and responsibilities included actively participating at task force meetings sponsored

8

by the LFUCG.  In March 2003, Commissioner White directed Ibarra not to speak out at a task force meeting.

Ultimately, however, Plaintiff fails in his efforts to identify a causal link between his protected conduct and his termination.  When asked in his deposition if he believed that his comments about Ben Figueras led to his termination, Ibarra replied that his speaking out about Figueras could have been a factor.  Ibarra testified that Figueras later met with Commissioner White at her office.  He suspects, but admitted in his deposition that he has no proof, that they spoke about terminating him.  When pressed for evidence that his comments about Figueras led to his termination, Ibarra admitted that he did not have any proof, but that he "deduced that from what I've gone through."  (Ibarra Dep. Vol. 1, June 30, 2005, 152:6-7.)  As the Sixth Circuit held in *Harbin-Bey v. Rutter*, 420 F.3d 571 (6th Cir. 2005), "conclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Id.* at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)).

Ibarra admitted in his deposition that Mayor Isaac had discretion to assign the identification card project to Commissioner White.  He also stated that he did not have any evidence that Mayor Isaac gave the project to Commissioner White because she was upset by Ibarra's speaking out on the issue.  Moreover, Ibarra has not presented any evidence that he was

9

terminated because he expressed interest in pursuing the identification card project.

Before he started on the resolution for Council Member Brooks, Ibarra did not inform Commissioner White of his plans to began work on the project. Ibarra concedes in his deposition that it was reasonable for Commissioner White to require him to talk to her before working on a resolution with a council member (Ibarra Dep. Vol. 1, 153:6.) Ibarra complains specifically about how Commissioner White did not inform him of that requirement in a "constructive non-reactionary way." (*Id.* 153:7-8) When asked whether he felt it was unreasonable for Commissioner White, his supervisor, to know what he was working on, Ibarra agreed that keeping Commissioner White informed was not an unreasonable request. Ibarra noted that Commissioner White told him that they, presumably Social Services, worked for the Mayor, not the Council. Ibarra emphasized, however, that he objected to her "demeanor" and analogized it to a drill sergeant telling him to "drop and do ten." (*Id.* 157:19.) Ibarra does not submit any evidence that Commissioner White or Mayor Isaac were adverse to the content of the resolution or that he was terminated because he spoke out about the need for a resolution to protect Lexington's Hispanic community from being defrauded or overcharged by service providers. Based on Plaintiff's testimony, Commissioner White's criticism was limited to her dissatisfaction with Ibarra for working on the resolution

10

without speaking with her first.

Ibarra attempts to raise a genuine issue of material fact by claiming that Defendants forbade him from speaking to the press. The memo submitted by Ibarra detailing the discussion during the March 13, 2003, meeting at which Ibarra was reprimanded for speaking to the press states that Ibarra was non-compliant with the expectations of his superiors by "[i]nterviewing with *El Mundo*, without obtaining prior approval for the interview" and for "[i]nterviewing with the *Lexington Herald-Leader* without prior approval." In his deposition, Ibarra explains that after March 13, 2003, he remembered Commissioner White telling him, "I need to know everything before you speak to the press. And don't speak to the press. I need to know everything before. . . . Explain what you want to talk to the press about, but don't talk to the press without me knowing everything." (Ibarra Dep. Vol. 1, 178:18-25.) Ibarra claims that he understood her to mean that he could not speak to the press. Ibarra's own emails, however, belie this conclusion about Commissioner White's instructions. Ibarra submitted emails he wrote to Commissioner White on April 24, 2003, and July 2, 2003, that show that he continued to speak to newspaper reporters after clearing the interviews with Mayor Isaac's press secretary, Bruce Edwards. Furthermore, Ibarra has not presented evidence that Defendant's decision to terminate his employment was motivated by his speaking to the press.

Ibarra conceded that the meeting at which he was told by Commissioner White to be quiet was a meeting at which Commissioner White told all LFUCG employees, except the meeting's moderator, to be quiet so that the audience members would be able to voice their concerns. Most troubling to Ibarra was the way in which Commissioner White silenced him: "I mean, it's not how — what things are said but how they're said that conveys a lot. And to me it conveyed: You shut up." (Ibarra Dep. Vol. 1, 142:25-143:2.) Plaintiff's dissatisfaction with the "way" in which Commissioner White ordered him to be quiet during a meeting does not give rise to liability under § 1983. Again, Ibarra has not presented evidence that supports his theory that his protected conduct was a motivating factor in the defendants' decision to terminate him.[1]

Ibarra has not presented evidence to establish that he was terminated because he spoke out about issues that affect

---

[1] Regarding the other examples presented by Ibarra, even if the Court assumes *arguendo* that Commissioner White's instructions to Ibarra (1) to not get involved in a police investigation of an immigrant smuggling scheme, (2) to not attend monthly budget meetings, (3) to relocate to a downtown office from his office at the Cardinal Valley Center, and her criticism of Ibarra for (4) not reporting to the downtown offices during the February 2003 ice storm and (5) for approving the establishment of a health clinic when a city contract was not in place are examples of Ibarra being reprimanded for engaging in conduct protected by the First Amendment, Ibarra has not shown that the decision to terminate him was based on that conduct. Furthermore, the Court reminds Ibarra of its holding in its November 9, 2004 Memorandum Opinion and Order: "[E]ven if the Court were to construe these actions as § 1983 violations, the claims are barred as all actions occurred more than one year before this action was filed on August 18, 2004."

Lexington's Hispanic community. He has not pointed to "'specific, nonconclusory allegations' reasonably linking [his] speech to [his termination]." *Bailey*, 106 F.3d at 144 (citing *Wright v. Illinois Dep't of Children & Family Servs.*, 40 F.3d 1492, 1500 (7th Cir. 1994)). Plaintiff has not presented any evidence that Defendants objected to the things that Ibarra was saying — local residents are being scammed, burning charcoal indoors is a dangerous alternative heating source, allowing certain individuals to produce identification cards will be unduly expensive for Lexington's Hispanic residents — instead, Defendants have presented evidence that they objected to the way in which Plaintiff was proceeding with his work without notifying his supervisor of his activities beforehand.[2]

At the March 13, 2003 meeting, Ibarra was reprimanded for non-compliance in the following areas: approaching Council Member Paul Brooks about the resolution without seeking prior approval from Commissioner White, interviewing with *El Mundo* and the *Lexington Herald-Leader* without seeking prior approval, not calling

---

[2] Ibarra has stated that Commissioner White, when referring to Ibarra's participation in a couple of newspaper articles, said that he had "pissed some people off." (Ibarra Dep. Vol. 2, July 30, 2005, 54:13.) Even if Ibarra could show that Defendants disagreed with his statements, that showing, without more, would still be insufficient. *See Bailey*, 106 F.3d at 145 ("[T]he nonmoving party may not rely on the mere fact that an adverse employment action followed speech that the employer would have liked to prevent. Rather, the employee must link the speech in question to the defendant's decision to dismiss her." (citations omitted)).

13

Commissioner White during the ice storm, and approving the establishment of a health clinic when there was no legal contract in place authorizing its establishment. Plaintiff has conceded that, in the March 13, 2003, memo and meeting, he was informed of how he was not complying with certain expectations of Mayor Isaac and her staff. Plaintiff argues that the March 13, 2003, meeting and memo "criticized and reprimanded [him] for his speech activities," and because the meeting and memo were mentioned in Commissioner White's August 26, 2003, memo recommending Ibarra's termination, the August memo "inextricably link[s] Ibarra's prior speech to his subsequent termination." The Court is not persuaded by Ibarra's attempts to connect the two memos to create a genuine issue. The August 2003 memo contains only one reference to the March 2003 meeting and memo: "Over the past eight months, I have periodically met with Mr. Ibarra. On March 13, 2003, Milton Dohoney, Gerald Smith and I met with Mr. Ibarra to discuss several job performance factors (see attached). Mr. Ibarra does not comply with the job requirements and he does not comply with supervision." The March memo criticizes Plaintiff's actions in speaking to the press and working on a resolution *without prior approval*. Whether Plaintiff felt "castigated" by the remarks made at the March 2003 meeting is immaterial. Moreover, in the August 26, 2003 memo, Commissioner White does not mention any disagreement or dissatisfaction with Ibarra for expressing his views about

14

Lexington's Hispanic community to the public or to her.[3]  Ibarra has not met his burden of presenting probative evidence that he was terminated because he exercised his First Amendment rights. Without any evidence that Defendants terminated him because he spoke out about certain issues, Ibarra cannot survive summary judgment on his § 1983 claim.[4]

Furthermore, the evidence that Plaintiff has submitted does not remedy the temporal disconnect between Ibarra's statements and his termination.  Several courts have considered the length of time

---

[3] Instead, in the memo, she bases her decision to recommend Ibarra's termination on the following:  Ibarra would not consistently provide her with a schedule of his work activities, he had not responded to her request for suggestions and/or goals for improving his work performance, he had not complied with her requests to schedule a visit to the Cardinal Valley Center, he did not attend two August 2003 meetings and did not provide an excuse for his absences, and in general, he had not complied with supervision.

[4] Ibarra claims that his case is almost identical to that of the plaintiff in *Cockrel v. Shelby County School District*, but unlike Cockrel, Ibarra has not presented "several pieces of evidence [that] work in [his] favor." *Cockrel*, 270 F.3d at 1056. In *Cockrel*, the Sixth Circuit noted the following favorable evidence:  the defendants initiated an early evaluation of Cockrel, Cockrel was the only tenured teacher to receive more than one evaluation within three years, the defendants instituted an open-ended evaluation after Cockrel engaged in the protected conduct in dispute, the evaluation was a factor in terminating Cockrel, attached to the evaluation were several letters from parents and staff critical of Cockrel's decision to engage in the protected conduct. *Id.*  Commissioner White met with Ibarra for his yearly evaluation on June 30, 2003 and July 1, 2003.  In contrast to Cockrel's situation, Ibarra neither claims that his evaluation was initiated in response to him engaging in protected conduct nor does he provide evidence that Defendants evaluated him more frequently than his co-workers or surprised him with early or unscheduled evaluations.

15

between the protected conduct and the adverse employment action as a factor in determining whether a plaintiff has linked his conduct to his former employer's adverse action. *See Timm v. Wright State Univ.*, 375 F.3d 418, 423 (6th Cir. 2004); *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999); *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986); *Dixon v. Gonzalez*, 382 F. Supp. 2d 911, 918 (E.D. Mich. 2005). In this case, Ibarra has not demonstrated that his protected conduct in January, February, and March of 2003 led to his termination several months later in August of 2003. Furthermore, Ibarra has not presented any evidence that he engaged in any protected conduct after March of 2003 that served as a motivating factor in his dismissal.[5]

---

[5] Based on Ibarra's submitted correspondence, in the five to six months that elapsed between Ibarra's protected conduct in the first three months of 2003 and his termination in August 2003, Ibarra continued to (1) inform Defendants of ways to assist Lexington's Hispanic community, *see* E-mail from Abdon Ibarra, to Alayne White (Mar. 6, 2003, 08:24) (regarding emergency response plan); E-mail from Abdon Ibarra, to Teresa Isaac (Apr. 3, 2003, 12:19) (discussing disturbances in Valley Park), (2) work at the Cardinal Valley Community Center, *see* E-mail from Abdon Ibarra, to Loretta Cory (Aug. 20, 2003, 08:19) (notifying Cory that he would be working at the Center that day), (3) speak to the press, *see* E-mail from Abdon Ibarra, to Alayne White (Apr. 24, 2003, 20:42) (discussing Ibarra's comments to a reporter on a new school superintendent); E-mail from Abdon Ibarra, to Alayne White (July 2, 2003, 07:42) (informing Commissioner White that he had spoken to reporters), and (4) attend training sessions, *see* E-mail from Abdon Ibarra, to Loretta Cory (July 16, 2003, 07:22) (regarding leadership training). Again, Ibarra does not present evidence that his protected conduct, whether it occurred before or after March of 2003, motivated Defendants to discharge him.

**CONCLUSION**

Ibarra's job duties as Immigrant Services Coordinator included assisting the LFUCG in understanding the needs of Lexington's Hispanic community.  Although Ibarra argues that he was terminated *because* he spoke out about these issues, he has failed to produce evidence linking that speech to his termination.  Without that evidence, he cannot set forth a prima facie case for retaliation in violation of the First Amendment.  As the Court will grant summary judgment in favor of Defendants, Defendants' motion for partial summary judgment on damages is denied as moot.

Accordingly, and for the reasons stated above, **IT IS ORDERED**:

(1)  that Defendants' motion for summary judgment on Plaintiff's claims against Mayor Isaac and Commissioner White in their official capacities [Record No. 25] be, and the same hereby is, **GRANTED**;

(2)  that Defendants' motion for summary judgment [Record No. 26] be, and the same hereby is, **GRANTED**; and

(3)  that Defendants' motion for partial summary judgment on damages [Record No. 22] be, and the same hereby is, **DENIED AS MOOT**.

This the 4th day of May, 2006.



**Signed By:**

*Joseph M. Hood*

**United States District Judge**